**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

BP AMERICA PRODUCTION COMPANY,     )
                                   )
                    Plaintiff,     )
                                   )
vs.                                )          Case No. CIV-10-519-M
                                   )
CHESAPEAKE EXPLORATION, LLC, et al.,     )
                                   )
                    Defendants.    )

## ORDER

On February 20, 21 and 25, 2013, the non-jury trial in this matter was held before Chief Judge Vicki Miles-LaGrange. During the trial of this matter, the Court heard testimony and received a variety of evidentiary materials. Upon review of the testimony and evidence presented, the Court makes its determination.

I.      Background

On or about July 14, 2008, plaintiff BP America Production Company ("BP") and defendants Chesapeake Exploration, L.L.C. and Chesapeake Investments, an Oklahoma Limited Partnership ("Chesapeake"), entered into a purchase sale agreement ("PSA") pursuant to which BP purchased a large number of Oklahoma oil and gas properties from Chesapeake. The purchase price was $1,750,000,000. The closing date was approximately three weeks after the agreement was signed, August 8, 2008.

The PSA was structured so that BP paid the full purchase price of $1.75 billion dollars at closing, but after closing, BP had a period to investigate and conduct due diligence on matters such as whether Chesapeake actually had title to all the properties it purported to sell BP. Specifically, Section 2 of the PSA provided for certain post-closing adjustment to the purchase price. Section 2.2

1

provided for adjustments related to title to the properties, which were defined as title defects (downward adjustment in favor of BP) and title benefits (upward adjustments in favor of Chesapeake).  In addition, there were other post-closing adjustments related to accounting issues. Sections 2.6 and 2.7 provided certain upward or downward adjustments designed to segregate those revenues and expenses attributable to the period before the PSA's effective date, from those on or after that date.  Section 2.8 provided that Chesapeake would provide estimates of the adjustments just prior to the closing date for purposes of adjusting the purchase price at closing, and Section 2.9 set forth the procedures for finalizing the adjustments after closing.

Section 2.2.14 of the PSA provides that if the parties could not resolve disputes over title defects or title benefits, the disputes were to be submitted to title arbitration before three title arbitrators selected by the parties.  The parties were required to submit any dispute to title arbitration if it involved title defects, title benefits or the adjustment to the purchase price with respect thereto. Section 2.9 of the PSA included a separate provision for arbitration of other accounting issues by a single accounting referee if the parties could not agree on a final statement that included all accounting adjustments to be made to the purchase price.

Pursuant to Section 2.2 of the PSA, the parties worked together after closing to attempt to identify and agree on the title to the properties that were sold, including specifically, whether Chesapeake had more or fewer acres than set forth in the schedules to the PSA.  By April 17, 2009, Chesapeake and BP had agreed on title defects valued at $116,234,556 pursuant to the terms of the PSA.  After deducting the aggregate defect threshold of $35,000,000, the amount due to BP for these agreed title defects was $81,234,556.  The parties were not able to resolve all of the title issues and submitted disputed title defects and title benefits to title arbitration pursuant to the PSA.  April 27,

2009 was the deadline for the parties to submit their notices of title arbitration.  On April 27, 2009, both parties submitted claims for post-closing title adjustment to the purchase price, which were set forth in their respective notices of title arbitration.

In BP's notice of title arbitration, BP sought in excess of $41,000,000 for disputed title defects.  In its notice and at the bottom of each page of the attachments to the notice, BP expressly reserved its rights relating to the agreed title defects if they later became disputed by Chesapeake. In Chesapeake's notice of title arbitration, Chesapeake submitted title benefit claims totaling $20,700,766.  Chesapeake's claims, when combined with the $20,572,576 in agreed title benefits, exceeded the $35,000,000 aggregate threshold by $6,273,342.  In addition, Chesapeake sought $15,991,961 in title credits.  Accordingly, as of April 27, 2009, when the title arbitration commenced, Chesapeake was seeking a total of $22,556,302 in the title arbitration.  Pursuant to Section 2.2.14 of the PSA, the parties selected a panel of three title arbitrators to determine their respective claims in title arbitration.

At the same time the parties were working on title issues, they were also working on separate issues relating to post-closing accounting adjustments. While one group of negotiators focused on the title issues, another group of negotiators focused on the accounting issues.  The procedures for arriving at the accounting adjustments were set forth in Section 2.9 of the PSA, which required that 120 days after the closing date, Chesapeake would provide a post closing statement setting forth a detailed calculation of all final adjustment to the purchase price.  If BP disputed Chesapeake's initial final statement, it could deliver a written exception report containing changes that BP proposed to the statement.  The parties were then to meet and confer to try to resolve the differences.  If they could not be resolved, any party could submit the dispute to arbitration before an accounting referee.

The procedures in Section 2.9 for post-closing adjustments did not displace the procedures for resolving title disputes, which were to be resolved separately under Section 2.2 of the PSA.  Section 2.2.14 of the PSA provided that if the title arbitrators had not rendered their decision on title disputes as of the date of Chesapeake's delivery of the final statement pursuant to Section 2.9 of the PSA, any amount owed as a result of the title arbitration is to be paid within five (5) days after the title arbitrators' determination.    The final statement was initially delivered by Chesapeake to BP on December 5, 2008, which was more than a year before the title arbitrators made any determination. In accordance with Section 2.2.14 of the PSA, any amounts due as a result of the decisions of the title arbitrators were payable five (5) days after the final determination by the title arbitrators.

On December 5, 2008, Chesapeake's initial proposed final statement setting forth Chesapeake's proposed adjustments to the purchase price was forwarded to BP, but it only dealt with accounting issues and contained no entries relating to title issues.  On April 9, 2009, BP responded to Chesapeake's proposed final statement with a transmittal letter and an exception report which included an Exception No. 27 - Agreed Purchase Price Adjustments re Certain title Defects - $80,799,079.60.  BP also reserved its right to seek further adjustments to the purchase price as there remained unresolved title defects.  On Friday, April 24, 2009 at 2:52 p.m., Hank Scheel of Chesapeake sent Bradley Bangle of BP a response to BP's exception report, setting forth Chesapeake's proposed dollar amount for each of the exception items BP had included with its April 9, 2009 revised final statement.  On Exception No. 27, Chesapeake inserted $58,969,253 in place of BP's $80,799,080.    The following Monday, April 27, 2009, was the deadline for the parties to give their notice of title arbitration.  On Monday morning, April 27, 2009, Brian Kastman of BP emailed and then called his counterpart at Chesapeake, Brian Exline to ask the basis for

4

Chesapeake's unexpected reduction of the agreed title defects from $80,799,080 to $58,969,253. During his deposition, Brian Exline testified that the $58,969,253 was based on Chesapeake applying a potential offset for what they thought was due Chesapeake in title arbitration. Whether or not Chesapeake would prevail on its claims in title arbitration, and therefore, whether it would have an offset would depend on the results of the title arbitration. BP did not submit any of the agreed title defects to title arbitration because the parties remained in agreement that a total of $81,234,556 remained due for agreed title defects, and these were not disputed by Chesapeake, but only being withheld as a potential future offset if Chesapeake received an affirmative recovery on its disputed claims in title arbitration at some later date.

The parties continued to negotiate over the disputed accounting adjustments, but no further negotiations took place over Exception No. 27. BP contends it understood, based on Chesapeake's representations, that payment of the remaining $22,265,302 in agreed title defects had to wait until the outcome of the title arbitration and the decision on the parties' remaining disputed title claims that had been submitted to title arbitration.

On May 8, 2009, BP submitted disputed accounting issues concerning the final statement to accounting arbitration before the accounting referee, pursuant to Section 2.9 of the PSA. Exception No. 27 was not submitted to accounting arbitration. BP again noted the reservation of its rights or remedies related to the title arbitration. On May 13, 2009, BP submitted its written statement of position and supporting documents in the accounting arbitration to Deloitte & Touche, the designated accounting referee in the PSA. BP also submitted a proposed form for the accounting referee award. The proposed accounting referee award form submitted by BP stated that the Exception No. 27 related to title arbitration. The parties exchanged numerous letters regarding the

accounting arbitration process.

On July 7, 2009, BP's Chief Financial Officer Timothy Harrington sent a letter to Chesapeake offering to settle the final statement and the ongoing disputes over accounting arbitration.  Harrington's letter stated, in part, as follows:

> BP and Chesapeake have reached consensus regarding the minimum price adjustments owed to BP which is $59,857,470 as evidenced by Mr. Hank Scheel's notice of April 24, 2009 to BP's Mr. Brad Bangle (Attachment "A").

Joint Trial Exhibit 5.

Chesapeake did not question or alter the terms of BP's July 7, 2009 offer.  Chesapeake accepted BP's July 7, 2009 offer on July 10, 2009 by letter from Chesapeake's Executive Vice President Douglas Jacobson.  Jacobson's letter stated in part:

> Based on this Agreement, we assume that both parties will take the appropriate actions to withdraw from the Final Statement arbitration. Notwithstanding the resolution of the Final Statement issues as agreed to herein, Chesapeake reserves all of its rights with regard to any other outstanding issues between the parties.

Joint Trial Exhibit 8.

Chesapeake then paid BP $59,857,470, of which $58,969,253 was attributed to the agreed title defects and the remaining $888,217, was attributed to the final statement items that had been submitted to accounting arbitration.  BP's July 7, 2009 offer letter and Chesapeake's July 10, 2009 acceptance letter, resulted in a settlement that ended the accounting arbitration.

Although the accounting arbitration had been ended pursuant to the terms of the July 7, 2009 letter agreement, the title arbitration continued on its own path.  Both parties continued to pursue its disputed title claims.   On July 7, 2009, the parties both submitted their written statements of position and supporting documents to the title arbitrators.  "BP sought a downward adjustment to

the Purchase Price in the amount of $313,028,163 attributable to a total of 244 alleged Title

Defects." Chesapeake "acknowledged full or partial Title Defects in 135 properties and agreed to

a downward adjustment to the Purchase Price in the amount of $116,234,556 attributed to 163 Title

Defects. BP agreed to retract 58 Title Defects. *See* Joint Exhibit 7, page 9.

The title arbitration panel issued an award on December 30, 2009. The panel awarded

$11,526,434 in title defects (subject to BP's acceptance of three conditional awards), and $3,727,031

in title benefits. The panel denied all of Chesapeake's claims for title credits (assuming BP elected

to accept a certain condition). Because the sum of the agreed title benefits and the disputed title

benefits awarded to Chesapeake by the arbitration panel was less than the $35,000,000 aggregate

defect threshold amount, there was no upward adjustment to the purchase price for Chesapeake.

Chesapeake received no award in title arbitration to off set the $22,265,302 balance of agreed title

defects that it had withheld pending title arbitration.

Although the title arbitration panel's December 30, 2009 award resolved the parties' title

disputes, the arbitration panel did not address the impact of its ruling on the amounts ultimately

owed by or to the parties under the PSA. The arbitration panel stated, in a section of the December

30, 2009 award labeled "Explanatory Comments,":

> The Panel has made no effort to determine, and the Panel makes no
> ruling herein, whether the threshold levels under the Purchase and
> Sale Agreement have been satisfied in order for any actual increases
> or decreases in amounts paid and/or received to result from the
> individual determinations below. The Panel assumes that, with the
> determinations made below, the parties can arrive at the impact of the
> Panel's rulings on the additional amounts to be paid and/or received
> by each of the parties. If that assumption is in error and if the parties
> need for the Panel to make those determinations, the parties should
> submit arbitration position statements on those issues for the
> consideration of the Panel, describing the additional issues to be
> determined and the argument of each party on those issues.

7

Joint Exhibit 10, page 2.

On January 5, 2010, BP sent an email to Chesapeake, and Chesapeake responded the same day.  BP sent a schedule with the email, which itemized the title defects due and total payment to BP of $33,791,736 ($11,526,434 awarded by the Arbitration Panel for disputed title defects, plus $22,265,302 for previously withheld agreed title defects).   BP requested an initial  payment of $21,345,550, because $12,446,186 was still subject to BP's acceptance of certain conditions imposed by the arbitration panel on three specific properties.  Chesapeake responded by stating:

> We are in receipt of and acknowledge your request for a payment. However, at this time we have only received a partial determination by the Panel.  Accordingly, payment will not be made until such time as the Panel's complete order is final, at which time we will tender the settlement required in accordance with the terms of the PSA.

Joint Exhibit 11, page 1.

On February 2, 2010, after certain elections were made by BP under the arbitration panel's award, Chesapeake paid BP $11,526,434.  BP also sent an email to the arbitration panel and Chesapeake advising that it had accepted all conditions imposed in the December 30, 2009 award and had tendered certain assignments to Chesapeake that were the subject of the conditional portions of the December 30, 2009 award.  BP also sought clarification that the award was intended to address Chesapeake's title benefit and title credit claims, and requested the arbitration panel to order Chesapeake to "make payment of the full $33,791,736 in accordance with the PSA and the Panel's award."  *See* Joint Exhibit 14, page 2.

On February 4, 2010, Chesapeake responded arguing that the arbitration panel had no further authority and could not consider the request for clarification.  BP replied on February 5, 2010 and again made its claim for the remaining $22,265,302 in agreed title defects explaining why

Chesapeake still owed that amount.  On February 9, 2010, the arbitration panel invited the parties

to respond to four specific questions relating to its authority to consider BP's request for clarification

and modification of the December 30, 2009 award.  The parties responded to the arbitration panel

on February 19, 2010, and submitted replies on February 26, 2010.

On March 11, 2010, the arbitration panel made the following statement in clarification as to

the intention of the panel in its December 30, 2009 award:

> The Panel understands that, during the course of the arbitration, one
> or both of the parties understandably withheld, either in part or in
> whole, payments that might be due to the other party if the
> withholding party did not prevail with regard to the disputed Title
> Defects, Title Benefits and Credit Claims that were submitted to
> arbitration.  The Panel advises the parties that as to all of its rulings
> concerning asserted Title Defects, Title Benefits and/or Credit
> Claims, it was the intention and assumption of the Panel that, to the
> extent that the only grounds a party had for withholding payment to
> the other party for the dollar amount associated with any such matters
> was that there had been no ruling by the Panel with regard to those
> issues, the amounts due for such matters would then become due in
> light of the Panel's decision.  If the parties contend that the absence
> of "order to pay" wording or similar wording in the Award was
> intended to indicate that the Panel ruled on certain issues but did not
> intend for its Award to have any impact on the dollar amounts a party
> owed to the other party, that is an incorrect interpretation of the
> Award.

Joint Exhibit 23, page 2.

Chesapeake sent an email to the arbitration panel on March 17, 2010 contesting the

arbitration panel's continued assertion of jurisdiction.   BP sent an email to the arbitration panel on

March 18, 2010 explaining that Chesapeake still refused to pay the $22,265,302, despite the

arbitration panel's clarification. On March 19, 2010 Chesapeake responded asserting the arbitration

panel had fully satisfied its obligations relative to the rendering of the "final award" on December

30, 2009.  Chesapeake also notes if the arbitration panel  persists in entertaining additional issues,

Chesapeake "has no alternative but to seek appropriate intervention from the district court to right this ship."  *See* Joint Exhibit 26, page 1.

On March 24, 2010, BP sent an email to the arbitration panel noting that Chesapeake still had not paid the full amount due as a result of the panel's arbitration award and requesting further clarification.  On April 2, 2010, the arbitration panel asked BP to provide a detailed explanation of the $22,265,302 of agreed title defects owed and permitted Chesapeake to respond on or before April 23, 2010.  On April 12, 2010, BP provided the detailed reconciliation requested by the arbitration panel demonstrating how it arrived at the $22,265,302 in agreed title defects withheld by Chesapeake.  Rather than responding to BP's April 12, 2010 submission to the arbitration panel, Chesapeake commenced this litigation in the state court on April 21, 2010, seeking an order prohibiting the arbitration panel from considering the matter further.  Specifically, Chesapeake sought to modify and confirm the arbitration panel's December 30, 2009 award, excluding the "Explanatory Comments", to vacate all post award rulings or orders by the arbitration panel and declaring the panel's task complete and its jurisdiction exhausted.

BP removed the case to this Court, and Chesapeake's motion to remand was denied on July 21, 2010.  On May 24, 2010, BP filed its Counterclaims.  The arbitration panel reconvened  and requested further briefing from the parties.  On January 26, 2011, the arbitration panel issued its last award.  On February 7, 2011, BP filed a Motion to Confirm Arbitration Award and Chesapeake filed its own Motion to Confirm Arbitration Award on March 2, 2011.

On August 26, 2011, Judge Heaton issued his Order in this case on the competing motions to confirm and concluded:

> The court concludes that insofar as the Panel addressed BP's entitlement to $22,265,302 or credit in that amount, it went beyond

the scope of what had been submitted to it. While it had the authority to, and did, address the impact of its specific title determinations on the overall purchase price (i.e. "title defects" credit to BP of $11,626,434; "title benefits" credit to Chesapeake of $3,727,031), that authority did not, based on the scope of the parties' submission letters, also extend to resolving other title-related disputes impacting the price such as the basis for BP's $22 million claim. Similarly, the Panel's conclusions as to the interest owing on those amounts was premature for the same reasons. The court does not suggest that the Panel's conclusions in this regard were wrong. Indeed, the Panel's conclusions as to the $22 million seem wholly defensible based on the present submissions. However, as the court's present focus is the confirmation of the Panel's award and the indicated portion thereof exceeded the scope of the arbitration, the court simply concludes the award to be confirmed does not include the indicated additional issues.

The broader issues sought to be raised by BP as to the $22 million are within the scope of its counterclaim and may be appropriate for resolution by this court at some point. However, the parties' present submissions, though extensive, are not summary judgment motions and have not been presented in that way. The court concludes it would be in appropriate, in the present posture of the case, to reach or resolve the broader issues involving BP's claim to the additional $22,265,302.

Judge Joe Heaton's August 26, 2011 Order, pages 6-7 [docket no. 48].

On September 20, 2011, the parties joint proposal for proceeding in this Court by filing cross-motions for summary judgment, rather than returning to arbitration was filed. On February 20, 2013, the trial of this action commenced.

II.     Discussion

In this case, BP is seeking a declaratory judgment as to the rights and the responsibilities of the parties with particular respect to $22,265,302 in unpaid agreed title defects. Chesapeake has asserted a number of affirmative defenses, including arbitration and award, res judicata, accord and satisfaction, consent, account stated and settled, parole evidence exclusion, statue of frauds and

waiver.  Chesapeake also argues that BP's claim for declaratory judgment is not properly before the Court, pursuant to the Federal Arbitration Act.

A.      Jurisdiction and Venue

BP contends its claim for declaratory judgment regarding Chesapeake's failure to pay $22,265,302 in agreed title defects, and corresponding request for a finding that payment is now due, are issues properly before the Court.  BP argues even if as Chesapeake argues, BP's claim is subject to one of the arbitration provision in the PSA, Chesapeake voluntarily and knowingly waived the right to arbitrate and is judicially estopped from now claiming that the Federal Arbitration Act, 9 U.S.C. § 1, et seq. ("FAA"), the Oklahoma Uniform Arbitration Act, Okla. Stat. tit. 12, § 1851, et seq. ("OUAA"), and case law interpreting those acts bar BP's Claim in the present case. Chesapeake contends whether the parties to the July 2009 letter agreement had a meeting of the minds is beyond the purview of this Court.

"The right to arbitration, like any other contract right, can be waived."  *Mertz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 39 F.3d 1482, 1489 (10th Cir. 1994).  In *Mertz,* the Tenth Circuit has established six criteria to consider in determining whether a party has waived it rights to arbitration:

> (1)      whether the party's actions are inconsistent with the right to arbitrate;
>
> (2)      whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate;
>
> (3)      whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay;

      (4)      whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings;

      (5)      whether important intervening steps [e.g. taking advantage of judicial discovery procedures not available in arbitration] had taken place; and

      (6)      whether the delay affected, misled, or prejudiced the opposing party.

*Id. citing Mertz*, 39 F.3d at 1489 (internal quotation marks omitted).

The Court has carefully reviewed the parties submissions and finds that the very reasons that this matter is now before this Court is because Chesapeake sought relief in the Oklahoma County district court from the arbitration Panel's consideration of BP's Claim. Chesapeake commenced this litigation on April 21, 2010, seeking an order prohibiting the arbitration panel from considering any further matters beyond those specifically addressed in the December 2009 award, and striking the arbitration panel's retention of jurisdiction to clarify or modify its ruling to address the impact of its award on purchase price adjustments.

Further, when BP requested this Court stay the litigation filed by Chesapeake until the arbitration panel completed its work, Chesapeake objected, contesting the arbitration panel's authority to decide BP's claim. After the granting of BP's motion to stay, the arbitration panel issued its last award on January 26, 2011, concluding that Chesapeake owed BP the additional $22,265,302, unless Chesapeake prevailed on certain defenses that the arbitration panel found were outside its preview. As opposed to accepting the judgment rendered by the arbitration panel, or challenging the panel's conclusion that its defenses were outside of the arbitration panel's authority, Chesapeake again acquiesced to the jurisdiction of this Court and sought affirmative relief. Chesapeake specifically moved the Court to determine that the arbitration panel lacked authority to

render any decision after its December 2009 award.  After Judge Heaton's August 26 2011 order in favor of Chesapeake's arguments against the arbitration panel's authority, the parties jointly submitted a proposed schedule for proceeding in this Court by filing cross-motions for summary judgment, rather than returning to arbitration.

Thereafter, Chesapeake engaged in extensive discovery, including written discovery requests and depositions of key BP witnesses, the parties filed final exhibit and witness lists, and each filed its own motion for summary judgment on the merits.  Having voluntarily and extensively engaged in the litigation process, the Court finds Chesapeake cannot now, change its mind.

Additionally, the Court finds Chesapeake's argument that the FAA, the OUAA and corresponding case law bar BP's claim in the present case is misplaced.  Chesapeake relies on the case *Hall Street Associated, L.L.C. v. Mattel, Inc.,* 552 U.S. 576, (2008) as authority for arguing that the Court lacks jurisdiction to hear BP's claim.  In *Hall Street* the Court refused to expand the categories of FAA §§ 9-11 for judicial review of arbitration award to permit a federal district court to conduct de novo review, even where the parties' had so agreed.  The Court held that vacating, modifying or correcting a final arbitration award as the exclusive grounds for vacatur and modification of a final arbitration award pursuant to provisions of the FAA.  Chesapeake also seems to rely on the recent case of *Nitro-Lift Technologies, L.L.C. v. Howard*, __ U.S. __, 133 S.Ct. 500 (2012) where the Supreme Court found the Oklahoma Supreme Court had exceeded its judicial authority in contravention of the FAA when it found that the parties' contract, which embodied an arbitration clause, was void.  Because the Oklahoma Supreme Court had invaded the province of the arbitrator in finding the entire contract, as opposed to only the anti-competition clause, void it had violated the FAA and controlling federal law.  The Court finds that the holdings in *Hall Street* and

14

*Nitro-Lift* has no bearing in this case where a final review of both BP's claim to $22,265,302 and

Chesapeake's defenses never occurred.  Because both the arbitrator panel and this Court specifically

left any ruling on BP's claim and Chesapeake's defenses to either further arbitration or litigation in

this Court and Chesapeake objecting to the authority of the title arbitration panel filed this action

where substantial judicial procedures have occurred, the Court finds it has jurisdiction to hear BP's

claim.

       B.     Chesapeake's Defenses

       1.     Res Judicata or Claim Preclusion

Chesapeake asserts that BP's claim is barred by the doctrine of res judicata.

This court must apply the res judicata (claim preclusion) rules of Oklahoma.  *Brady v. UBS*

*Fin. Serv.,* 538 F.3d 1319 (10th Cir. 2008).  Under Oklahoma law, "[a]n arbitration award has the

same force and effect as a judgment of a court of competent jurisdiction for claim preclusion

purposes.  To prevail on this defense a Chesapeake must prove:

    (1)    an identity of subject matter, of the parties or their privies, of
         the capacity of the parties and of the cause of action

    (2)    the court which heard the original action must have been one
         of competent jurisdiction, and

    (3)    the judgment rendered must have been a judgment on the
         merits of the case and not upon purely technical grounds.

*Carris v. John R. Thomas and Assoc.,* 896 P.2d 522, 527 (Okla. 1995).

Oklahoma follows the Restatement of Judgment (Second), § 13 (1982) which requires that

a judgment be "final" before it can be the subject of a defense of res judicata, or claim preclusion.

To be granted preclusive effect, the judgment must be final and not subject to reconsideration or

amendment.  *See Doyle v. Smith,* 202 P.3d 856, 864 (Okla. Civ. App. 2009).  The final judgment

requirement applies equally when the basis of a claim of res judicata or claim preclusion is an earlier arbitration award.  *See Stifel, Nicolaus & Co., Inc. V. Woolsey & Co., Inc.,* 81 F.3d 1540 (10th Cir. 1996).

Here, it is undisputed that neither the arbitration panel nor this Court has ruled on BP's claim.  Both the arbitration panel and this Court found that Chesapeake's defenses to BP's claim for the $22,265,302 were beyond the scope of the issues presented by Chesapeake and BP for arbitration, and beyond the relief the Court could grant on the parties' competing motions to confirm the December 2009 award.  The Court finds, because both the arbitration panel and the Court found that BP's claim and Chesapeake's corresponding defenses related to that claim were not the proper subject of either arbitration or court proceedings on the parties' motion to confirm the Panel's award, neither the Panel nor this Court entered a final judgment on the merits of BP's claim or Chesapeake's affirmative defenses to that claim.  Accordingly, the doctrine of res judicata/claim preclusion cannot apply to bar BP's claim in this case.

2.      Title Arbitrators Award

Chesapeake also argues that the Court has no authority to consider BP's claim because after the Court confirmed certain parts of the arbitration panel's award in its August 26, 2011 order, there is nothing further for the Court to decide.  Chesapeake appears to argue that BP's claim is somehow barred by the arbitration panel's previous awards.  However, as with Chesapeake's res judicata defense, this defense fails because Judge Heaton's August 26 2011 order, found that BP's claim was still viable.  As previously noted, the August 26, 2011 order made it clear neither the arbitration panel nor this Court entered a final judgment, or award, on the merits of BP's claim.

In the instant case, the arbitration panel has not conclusively resolved BP's outstanding

claim.  Similarly, the Court found that while it could not resolve BP's claim in the context of the parties' motions to confirm the award, it could resolve BP's claim in this case at a future date.  As such, the Court finds that there has not been an arbitrators award as to BP's claim.  Accordingly, the Court denies Chesapeake's defense of title arbitrators award.

3.    Accord and Satisfaction

It remains undisputed that the parties reached an agreement in July 2009 as to the accounting arbitration.  However, to prove an accord and satisfaction as to Chesapeake's obligation to pay $22,265,302 of agreed title defects Chesapeake must establish there was a meeting of the minds:

> Whether the parties have reached an accord and satisfaction depends upon the circumstances in each case and must be ascertained from the parties' intentions.  Evidence of an accord and satisfaction must show that the parties reached a meeting of the minds and that the purpose and intent of the parties was to discharge a prior obligation. . .

*Cinco Enterprises, Inc. v. Benso,* 890 P.2d 866, 874 (Okla. 1994).  Such a showing "must be satisfactorily proven" by Chesapeake as the party asserting the defense.  *Fast Motor Co. v. Morgan* 52 P.2d 25, 27 (Okla. 1935).

However, the evidence does not show that the parties had a mutual intent to discharge Chesapeake's obligation to pay $22,265,302 of agreed title defects when they entered into the July 2009 letter agreement.  The evidence supports BP's position that the July 2009 agreement preserved BP's right to receive payment for the remaining agreed title defects if they were not later set off by an award to Chesapeake in title arbitration.  Neither BP's Tim Harrington, who wrote the July 7, 2009 offer letter nor Mr. Kastmen, who assisted him in preparing the letter, intended to simply give away $22,265,302.  During the trial, Chesapeake's Brian Exline testified to his understanding that the July 2009 letter agreement did not reference waiving the $22, 265,302 in agreed title defects.

Even if Chesapeake had a different understanding of the July 2009 letter agreement, it cannot be the basis of sustaining a defense of accord and satisfaction.

Under Oklahoma law, a binding contract requires a meeting of the minds.  "Consent is not mutual unless the parties all agree upon the same thing in the same sense.  OKLA. STAT. tit 15, § 66.  The Court finds that even if Chesapeake truly understood BP's offer to include a release of the remaining $22,265,302 in agreed title defects claims, that understanding clearly differed from BP's understanding, and there was no meeting of the minds.  Accordingly, the Court denies Chesapeake's accord and satisfaction defense.[1]

### 4.    Account Stated and Settled

Just as with accord and satisfaction and consent, Chesapeake's claim of account stated fails. In other words, "[i]f either party did not understand the statement as a final adjustment of their respective demands then under consideration the statement is not an account stated.  *See Moyer v. Closs*, 97 P.2d 901, 903 (Okla. 1939).  As with any contract, an account stated cannot be formed without the assent of the party against whom the the defense is asserted.  Therefore, "an account rendered will not become an account stated as long as some of the items thereof are in dispute," *See Givens v. Parker,* 258 P.2d 936, 938 (Okla. 1953).

Chesapeake bears the burden of proving that the July 2009 letter agreement constituted an account stated and settled that bars BP's recovery of the remaining $22,265,302 in agreed title defects.  Chesapeake appears to rely on the facts that BP's July 2009 offer letter quoted only $59,857,470 rather than the previously stated $81,234,556 in agreed title defects, and that

---

[1]Pursuant to OKLA. STAT. tit 15 §66 the Court finds BP did not consent or agree to release the remaining $22,265,302.

Chesapeake assented to BP's offer and wired $59,857,470 three days later.  Although Chesapeake can point to a $22,265,302 difference between the parties April 17, 2009 appraisal of agreed title defects and the amount recited in the parties' July 2009 letter agreement, Chesapeake has offered no evidence that BP unequivocally made the July 2009 offer and entered into the resulting letter agreement wit the understanding that doing so would extinguish all obligation for Chesapeake to pay the remaining $22,265,302.  The plain language of BP's July 2009 letter simply cannot be reconciled with the notion of a final and unconditional adjustment of all matters of account between BP and Chesapeake when that letter described the $59,857,470 as the minimum price adjustment owed to BP.  Accordingly, the Court denies Chesapeake's account stated and settled defense.

### 5.    Parol Evidence Rule

Chesapeake also argues that the parole evidence rule precludes consideration of any other agreements between the parties or discussions held prior to the July 2009 letter agreement.  Specifically, Chesapeake contends the execution of the July 2009 letter agreement excludes all oral negotiations or stipulations concerning this subject matter, which preceded or accompanied the execution of that agreement.  BP contends the PSA and the parties' undisputed agreement that Chesapeake owed BP a purchase price adjustment for $116,234,556 in agreed title defects must also be read and interpreted in conjunction with the July 2009 letter agreement.  BP contends taken together, these three agreements are part of a single transaction intended to arrive at the proper adjusted purchase price.  BP argues the July 2009 letter agreement does not purport to modify or change either of the other two agreements, which, taken together, are part of a single transaction to arrive at the proper purchase price.  BP notes the PSA specifically encompassed additional documents and agreements related to the ongoing due diligence post-closing.  PSA ¶15.8 states:

> Entire Agreement.  This Agreement, the Assignment, and the other documents contemplated by this Agreement constitute the entire agreement between the Parties with respect to the subject matter hereof and there are no agreements, understandings, warranties or representations except as set forth herein or therein.

Joint Exhibit 1 ¶15.8, page 57.

Oklahoma's rules of contract construction permit the Court to look beyond the four corners of the written instrument to circumstances surrounding its execution.

> The Oklahoma statutory rules of construction establish that: the language of a contract governs its interpretation, if the language is clear and explicit and does not involve an absurdity.  (Okla. Stat. Tit. 14, §§154, 155); a contract is to be taken as a whole, giving effect to every part if reasonably practicable, each clause helping to interpret the other (id. §157); a contract must receive such an interpretation as will make it operative, definite, reasonable and capable of being carried into effect (id. §159); words of a contract are to be given their ordinary and popular meaning (id. §150); and a contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates (id. §163).

*Ackerman McQueen, Inc. v. B Equal Co.,* F.R.D. 484, 488 (W.D. Okla. 2009).  "If there are several contracts relating to the same matter, between the same parties, and made as parts of substantially one transaction, we will interpret the contracts together."  *Chesapeake Exploration Ltd. P'ship v. Chesapeake Exploration Ltd. P'ship,* 2004 OK CIV APP 94, 103 P.2d 621,625.

Oklahoma courts recognize that the parole evidence rule "only forbids parol evidence of prior or contemporaneous oral agreements which contradict, vary, or are inconsistent with the writing and does not preclude oral agreements on collateral matters."  *Hemphill Crop. v. Guy H. James Const. Co.,* 1980 OK CIV APP 26 ¶ 5, 620 P.2d 464, 465.  Thus, it becomes necessary to determine "whether the parties intended the writing to be a completely integrated statement of their agreement or whether it was only intended as a partial integration."  *Id.* at ¶ 6, 620 P.2d at 465.  Under Oklahoma's approach to determining integration, "[w]here the writing appears incomplete,

consistent additional terms may be proved by parol."  *Id.* at ¶ 7, 620 P.2d at 466.

Upon the Court's review of communications cited within the July 2009 letters, the $59,857,470 payment did not represent the parties' entire agreement as to agreed title defects.  It is equally evident that whatever meaning the parties mutually ascribed to the term "minimum price adjustments owed to BP" had to have been established in the earlier communications between the parties.  Additionally, considering the $22,265,302 variation between April and July 2009, the term "minimum price adjustments" plainly suggests that the parties had a collateral explanation concerning the $22,265,302 not fully set forth in the July 2009 letter agreement.  Therefore, the Court finds that considering the evidence and testimony regarding that collateral explanation would not contradict or be inconsistent with any aspect of the understanding set forth in the July 2009 agreement, the consideration of evidence and testimony regarding that collateral explanations does not violate the parol evidence rule.

6.    Statute of Frauds.

Under PSA ¶15.10, amendments to the PSA must be in a writing signed by the party to be charged.  According to Chesapeake, the PSA itself does not provide that unawarded title benefits would result in a downward price adjustment.  Chesapeake contends the oral agreement providing for such an adjustment constitutes an amendment of the PSA.  Chesapeake argues that the statute of frauds bars BP's claim to the extent BP alleges that oral agreements modified the express, executed final statement settlement, or amended the PSA to provide for a downward price adjustment resulting from unawarded title benefits.

BP contends its claims are based on three written agreements and the decision of the title arbitrators, none of which are disputed: (1) the PSA, which expressly provides for adjustment to the purchase price for title defects and title benefits and established the mechanisms for arriving at the

corrected amount for the adjustments; (2) the parties' agreement as to the $116,234,556 in agreed

title defects, resulting in a purchase price adjustment of $81,234,556 (after deducting the aggregate

defect threshold); (3) the July 2009 letter agreement providing for payment of $59,857,470 not

subject to further offset or adjustment, and (4) the title arbitrators' award denying Chesapeake's

$22,265,302 in offsets, leaving payment of $22,265,302 in agreed title defects outstanding.  BP

contends the PSA plainly provides for negotiation between the parties for adjustment of the contract

price resulting from mutually recognized title defects.  BP contends Chesapeake's actions in

conditionally withhold $22,265,302 of agreed title defects as a possible offset pending arbitration

of the remaining disputed title claims falls within these provisions for negotiation, and therefore does

not constitute a modification or amendment of the PSA.

Oklahoma courts have held that, where a contract to which the statute of frauds applies

expressly provides for later adjustment of its terms, the statute of frauds does not require such

adjustment to occur in writing.  *See Ketcham v. Oil Field Supply Co.,* 1923 OK 1120, ¶¶9-10, 226

P. 93,95-96.

The Tenth Circuit has applied similar principles to a contract for the sale of real property that

expressly permitted the purchaser to either waive title defects or to rescind the contract.  *See Jones

v. Dickens,* 394 F.2d 233, 234 (10th Cir. 1968).

> On the question of waiver of title defects, appellants contend that any
> waiver must be in writing; otherwise it would be an oral modification
> of the contract for the sale of land contrary to the statute of frauds.
> We cannot agree as the contract expressly provides for an election on
> the part of the purchasers either to waiver the defects or rescind the
> contract.  Thus the waiver here found was not a modification of the
> written contract, but rather the selection of an alternative expressly
> provided for.  It is thus part of the performance of the agreement.

*Id.* at 235.

Additionally, "'the provisions of the statute of frauds . . . have no application where the

agreement has been completely performed as to the part thereof which comes within the statute, and the part remaining to be performed is merely a payment of money . . .'" *Merfeld v. Anderson,* 1924 OK 179, ¶9, 2224 P. 161, 163 (quoting syllabus of *Logan v. Brown,* 1908 OK 29, 95 P. 441). "'The statute is no bar to an action for the price of land actually conveyed where the deed has been accepted or title has otherwise passed. . . .'" *Id.*

Upon review of the extensive record in this case, the Court finds that Chesapeake transferred title to the properties in question to BP at the August 8, 2008 closing.  This component of the transaction was what brought the PSA within the statute of frauds, but once that component was complete, the statute had no further application.  Therefore, any subsequent agreement concerning the method and amount to be refunded or paid could be made orally without violating the statute of fraud.  Based on the above, Chesapeake's statute of frauds defense is denied.

> 7.    Waiver.

The PSA ¶2.2.13 states:

> If the Sellers and the Buyers are not in agreement as to whether a Title Defect of Title Benefit exist or the amounts thereof, either Party shall have a period of thirty (30) days after the Defect Date for Title Defects to submit the dispute to arbitration as provided in Section 2.2.14 or waive such dispute.

Pursuant to ¶2.2.13, Chesapeake also contends that BP waived any claim to the $22,265,302 in agreed title defects because BP failed to submit this matter in its April 27, 2009 Notice of Arbitration.  However, PSA ¶2.214 only requires Title Arbitration per the terms of the provision and its corresponding deadlines "[i]f there is a dispute between the Sellers and Buyer involving title defects.  BP contends there was no dispute regarding the $22,265,302 in agreed title defects withheld from the final statement.  Because the parties had agreed that such amount was owed, there was no dispute to submit to title arbitrators.

Under Oklahoma law, "the doctrine of waiver focuses on the intention of the party against whom waiver is asserted; that is, the party must have the intent to waive its right." *See, Murphy Oil USA, Inc. v. Wood,* 438 F.3d 1008, 1013 (10th Cir. 2006).  Here, the evidence shows that BP had no intention of waiving its right to recover the balance of $22,265,302 in agreed title defects withheld by Chesapeake pending title arbitration.  Because BP did not intend to waive its right to the $22,265,302 in agreed title defects, the Court finds Chesapeake's waiver defense is denied.

IV.    Conclusion

Pursuant to the foregoing, the Court finds for plaintiff BP America Production Company and against defendants Chesapeake Exploration, L.L.C. and Chesapeake Investments, an Oklahoma Limited Partnership, jointly and severally.  Accordingly, the Court enters judgment in favor of plaintiff BP American Production Company for the sum of $22,265,302 for unpaid agreed title

defects with interest accrued and accruing thereon from and after February 2, 2010 at the rate of six percent (6%) per annum until paid.[2]  Additionally, the Court finds the issue of attorneys' fees and costs  premature to be submitted by separate motion and considered by the Court at a later date.

**IT IS SO ORDERED this 5th day of April, 2013.**


VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE

---

[2]Pursuant to Section 2.2.14 of the PSA, the $22,265,302 in agreed title defects was due five days after the award.  The first award was issued by the arbitration panel on December 30, 2009, but certain aspects of the award were conditional and subject to BP's acceptance.  By February 2, 2010, BP had accepted the conditions imposed by the award, and BP was vested with the right to receive the $22,265,302 that Chesapeake had withheld pending outcome of the title arbitration.